# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | |
|---|---|
| IN RE: ) | Case No. 18-83442-CRJ-11 |
| ) | |
| WILLIAM BARRIER ROBERTS, ) | Chapter 11 |
| ) | |
| Debtor. ) | |
| ) | |

## EMERGENCY MOTION FOR RELIEF FROM THE AUTOMATIC STAY

Pursuant to § 362(d) of Title 11 of the United States Code, 11 U.S.C. §101 *et seq.* (the "Bankruptcy Code") and Rule 4001(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Rules"), **Melanie Hammer Murray** ("Murray") and **Bullet & Barrel, LLC** ("Bullet & Barrel" and, together with Murray, the "Movants"), as creditors and parties in interest in the above captioned proceeding (this "Case"), hereby move (this "Motion") this honorable Court to enter an order authorizing Murray to purchase Additional Units to Murray for $1 per Unit by (i) clarifying that the automatic stay imposed by Bankruptcy Code §362(a) does not prohibit such a transaction; or, in the alternative, (ii) granting Movants relief from the automatic stay by terminating, annulling, modifying, or otherwise conditioning the automatic stay and waiving the 14-day stay of such order under Rule 4001(a)(3) so that Movants may cause Bullet & Barrel to issue Additional Units to Murray for $1 per share, pursuant to the B&B Agreement, thereby reducing the ownership stake of **William Barrier Roberts** ("Debtor") in Bullet & Barrel to less than 20% and allowing Bullet & Barrel to qualify for (a) financial relief from the U.S. Small Business Administration (the "SBA") under the Paycheck Protection Program (the "PPP") enacted by the Coronavirus Aid, Relief, and Economic Security Act , Pub. L. No. 116-136 [HR 748] (Mar. 27, 2020) (the "CARES Act"); and (b) traditional SBA financing. In support of this Motion, Movants offer the *Declaration*

of *Melanie Hammer Murray* (the "Murray Declaration");[1] the *Deposition Transcript of Nicole Reed* (AP Doc. 78-1)[2] (the "Reed Deposition Transcript") and state as follows:

## RELIEF REQUESTED

1. Like nearly all retail businesses, worldwide, Bullet & Barrel has been negatively affected by the coronavirus pandemic, and current economic uncertainty makes the probability of a quick turnaround very unlikely. To mitigate the unprecedented economic impact of public health measures to minimize the spread of the novel coronavirus SARS-COV-2 and its associated disease, COVID-19, Congress enacted the CARES Act, which, among other things, adds a new Business Loan Program (the PPP) to the SBA to provide loans to eligible businesses to cover payroll, benefits, mortgage and rent payments, and other operating expenses. To qualify, no owner holding a 20% or greater ownership stake in the applying entity may be a debtor in bankruptcy. Movants assert that the *Limited Liability Company Agreement of Bullet & Barrel, LLC* (the "B&B Agreement") permits Murray to purchase sufficient Additional Units to cause Bullet & Barrel to qualify for PPP relief without implicating the automatic stay. However, out of an abundance of caution and to the extent the Court deems such relief necessary, Movants request relief from the automatic stay to allow Murray to purchase Additional Units, pursuant to § 10.10(b) of the B&B Agreement, to enable Bullet & Barrel to receive much-needed funds through the CARES Act's PPP. In consideration for such Additional Units, Murray will pay the same amount per unit paid by the Members in connection with their Initial Capital Contributions by forgiving her outstanding loans to Bullet & Barrel. Moreover, the knock-on effect of this transaction would be to allow Bullet & Barrel to obtain SBA funding originally sought before this Case commenced.

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them by the Murray Declaration.

[2] References to the docket of that certain adversary proceeding No. 19-80017-CRJ (the "AP") will be designated as (AP Doc. __). All other docket references are references to the docket of this Case, unless expressly noted otherwise.

## JURISDICTION AND VENUE

2. The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334 and the *General Order of Reference* from the United States District Court for the Northern District of Alabama dated January 12, 1995.

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## BASES FOR RELIEF

4. The bases for the relief requested herein are §§ 105(a) and 362(d) of the Bankruptcy Code and Rule 4001.

## NARRATIVE SUMMARY OF FACT

**A. Pre-petition background and the B&B Agreement.**

5. On or about April 15, 2017, Murray and the Debtor formed Bullet & Barrel and entered the B&B Agreement, which governs Murray's and the Debtor's duties and obligations to each other, as Members, and to Bullet & Barrel, with respect to governance. (*See* Claim 11-2, 1). (*See also* Murray Decl., ¶ 4).

6. Murray is the President of Bullet & Barrel and sole member of the Bullet & Barrel Management Committee. (*Id.* ¶ 6).

7. Murray currently holds 510,000 Units (51%) and the Debtor currently holds 490,000 Units (49%). (*Id.* ¶ 7).

8. The B&B Agreement permits Bullet & Barrel, "upon consent or vote of the Management Committee, [to] increase the number of Units owned by an existing Member upon such terms and conditions as may be determined appropriate by the Management Committee." (Bullet & Barrel Agreement § 10.10(b)).

9. In June 2017, Bullet & Barrel applied for a "Section 504 Loan" through the SBA. (*See* Reed Dep. Trans., Def's Ex. 2). As Nicole Reed explained at her deposition,

3

> The purpose of this program is to stimulate economic development and create jobs, and one of the ways that it does it is by coming in on a second mortgage basis behind a bank. It reduces the bank's risk because the bank's had a first mortgage of 50 percent loan to value. SBA is taking the more -- the second mortgage, the junior position. So SBA is absorbing the risk.

(Reed Dep. Trans., 75:1–10).[3] Section 504 Loans are not construction loans, and are funded only "after the construction is complete. And [are] not for inventory or working capital or any other purpose than fixed assets." (*Id.* 13:4–7); (*see also id.* 94:1–9) (discussing evidence of completion of construction and absence of claims for materialman's liens and mechanic's liens required before SBA funding can be approved).

10. Some-time in the summer of 2017, the SBA approved Bullet & Barrel's application for a Section 504 Loan. (*See id.* 93:6–23). This approval is valid through July 17, 2021, but "contingent upon no adverse change in the financial condition of the borrower between the time [of the application] and the time" of SBA funding. (*Id.* 62:9–3).

11. In July 2017, Bullet & Barrel obtained financing through First National Bank ("FNB") to fund its business operations, including the construction of its building. This financing included: (1) $4,583,837.00 provided pursuant to a Construction Loan Agreement, and related documents, including, among other things, a Promissory Note, Commercial Security Agreement and series of Commercial Guaranties executed by Debtor, Murray, and Murray's husband, Dr. Rhett Murray (collectively, the "2017 Construction Loan," Loan No. xxxxx8000).

---

[3] Under the Section 504 Loan Program, the SBA will fund up to 40% of total project costs, secured by a second lien, typically with a participating lender covering up to 50% of the total project costs, secured by a first lien, and the borrower contributing at least 10% of the project costs. *See* https://www.sba.gov/offices/headquarters/ofa/resources/4049. In practice, Section 504 Loans are regularly used to re-finance 40% of a construction project's total cost following construction, with the private lender providing initial construction financing for 90% of project costs and retaining its first lien position, prior to the SBA, upon funding of the SBA Section 504 Loan at a lower rate of interest. (*See, e.g.*, Reed Dep. Trans., 13:3–7).

4

12. Thereafter, Bullet & Barrel suffered hundreds of thousands of dollars in unexpected, unbudgeted, and unnecessary construction cost overruns, and in July 2018, B&B was forced to modify the 2017 Construction Loan to increase the principal balance by more than $630,000.00 to a total of $5,214,573.00. This modification was evidenced by a new Construction Loan Agreement and related documents, including, among other things, Commercial Guaranties executed by Debtor, Murray, and Dr. Murray (the "2018 Construction Loan," Loan No. xxxxx2200, and, severally and collectively with the 2017 Construction Loan, the "FNB Loan").

13. The FNB Loans are evidenced by promissory notes, which Bullet & Barrel has renewed on an annual basis upon maturity. Under the latest renewal of the FNB Loan, interest accrues on the unpaid principal balance at the rate of 6.25%, per annum. (*See*, *e.g.*, Patterson Dep. Trans., 36:7–14, 73:8–22).

14. The pendency of the Case and AP constitute material adverse changes that preclude the SBA from funding Bullet & Barrel's Section 504 Loan. (*See* Reed Dep. Trans., 45:15–46:9; 63:4–8; 73:4–74:10). As a result, Bullet & Barrel has been forced to continue to pay the higher interest rates under the FNB Loans for 100% of the construction project's cost: a significant expense for Bullet & Barrel.

15. Ms. Reed testified that Bullet & Barrel's annual interest rate on the Section 504 Loan would be fixed at "about 3.7" percent, for a 20-year term. (Reed Dep. Trans., 65:8–11). *See also* 13 C.F.R. § 120.921.

**B.  Relevant procedural background of this Case.**

16. On November 16, 2018, Debtor commenced this Case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. (Doc. 1).

5

17. On March 21, 2019, Debtor commenced an adversary proceeding (the "AP") against Murray. (AP Doc. 1).

18. On February 24, 2020, the Court held a hearing in the AP, where it entered summary judgment against Debtor's remaining claims and against Movants' claims stated in their counterclaim. (*See* AP Doc. 93). (*See also* Doc. 303) (disallowing Murray's Claim No. 11).

19. At the February 24, 2020 AP hearing, the Court extended the deadline to object to Debtor's most recently proposed plan of reorganization (Doc. 203) (the "Plan"), (*see* AP Doc. 98; *see also* Doc. 310), and noted that the proper mechanism to seek relief to follow the provisions of the B&B Agreement allowing the modification of Members' respective proportional interests in Bullet & Barrel would be a motion for relief from the automatic stay.

20. Nothing in the Debtor's Plan suggests that his retention of a 49% interest in Bullet & Barrel is necessary for him to achieve an effective reorganization.

21. There is no certainty about when this Case and the AP will be resolved. The hearing on confirmation of the Debtor's proposed Plan and the trial on Debtor's objections to Movants' remaining claims has been continued multiple times, and, in light of concerns related to the Debtor's health and related to the current pandemic, there is no certainty that either matter will be resolved soon.

**C.  Current economic circumstances and Bullet & Barrel's need for PPP funds.**

22. Since forming Bullet & Barrel, Murray has been forced to personally advance hundreds of thousands of dollars to fund Bullet & Barrel's operations and meet the company's liabilities as they became due.

6

23. As of February 29, 2020, Murray had contributed $1,414,188.94 in the form of loans to Bullet & Barrel to facilitate its continued operation, in addition to her Capital Contributions. (Murray Decl., ¶ 8).

24. On March 17, 2020, Murray contributed an additional $38,356.91 in the form of a loan to Bullet & Barrel to facilitate its continued operation. (*Id.* ¶ 9).

25. As of the date of this Motion, Murray has loaned Bullet & Barrel a minimum of $1,452,545.85. (*Id.* ¶ 10).

26. The current pandemic poses a threat to the continued viability of Bullet & Barrel's business. Before the outbreak of the novel coronavirus, the US economy looked to be doing moderately well. Then came SARS-COV-2 and its associated disease, COVID-19, and with it social distancing precautions and corresponding reductions in consumer spending.[4] As a result, Bullet & Barrel's cost of goods sold has already increased and Bullet & Barrel anticipates lower future revenues. (*Id.* ¶ 12).

27. This economic uncertainty makes access to additional credit necessary for Bullet & Barrel to attempt to ensure sufficient cash flows to meet its ongoing payroll, benefit, mortgage, and other operating expenses. (*Id.* ¶ 13).

28. The PPP, enacted under the CARES Act, offers Bullet & Barrel the opportunity to obtain such relief to weather the storm catalyzed by the novel coronavirus, if Bullet & Barrel can become a qualifying business applicant.

29. To enable Bullet & Barrel to qualify to participate in the PPP, Murray is willing to forgive the outstanding $1,452,545.85 balance of her loans to Bullet & Barrel in consideration for

---

[4] For a description of the potential economic impact of the novel coronavirus, SARS-COV-2, on the U.S. economy based on the latest available data, *see* https://www2.deloitte.com/us/en/insights/economy/us-economic-forecast/united-states-outlook-analysis.html.

7

1,452,546 Additional Units purchased at $1 per Unit—the same price paid for Units acquired in connection with Members' Initial Capital Contributions. (Murray Decl., ¶ 14). (*See also* B&B Agreement, Ex. A) (showing that Units were purchased at $1 each).

30. If Murray receives 1,452,546 Additional Units in Bullet & Barrel, then she will hold 1,962,546 Units, the Debtor will retain 490,000 Units, and there will be a total of 2,452,546 Units issued by Bullet & Barrel. (*Id.* ¶ 15).

31. Thus, if Bullet & Barrel issues 1,452,546 Additional Units to Murray, then she will hold 80.02% of all 2,452,546 Units, while the Debtor will hold 19.08% of such Units. (*Id.* ¶ 16).

32. Murray has been advised by bankers and her accountant that this contemplated transaction would enable Bullet & Barrel to qualify for PPP funds and to obtain funds under the previously approved Section 504 Loan. (*Id.* ¶ 17).

33. In her business judgment, Murray believes it would be in the best interest of Bullet & Barrel to obtain financing through the PPP and to refinance a portion of the FNB Loans as a Section 504 Loan. (*Id.* ¶ 18).

## ARGUMENT

Movants believe that they are not required to obtain relief from the automatic stay in order for Murray to exercise her reasonable business judgment to protect Bullet & Barrel in the midst of a crisis in accordance with the B&B Agreement. Nevertheless, Movants make this Motion out of an abundance of caution. If the Court determines that the automatic stay prohibits Murray from purchasing Additional Units without first obtaining relief under Bankruptcy Code § 362(d), then the Court should grant Movants relief from the automatic stay to enable the company to obtain relief under the CARES Act. The B&B Agreement, to which the Debtor agreed, provides the mechanism by which the Movants may render Bullet & Barrel eligible to participate in PPP: it allows Murray to purchase Additional Units, subject to Management Committee approval. Current

8

economic circumstances and congressional intervention recognizing the dire effects that the novel coronavirus has wreaked, and will continue to wreak, on the economy constitute cause to allow Movants to take advantage of Congress's intended relief. Further, Debtor's relative ownership interest in all outstanding Bullet & Barrel Units is simply irrelevant to an effective reorganization in this Case. Therefore, Court should, if it deems such relief necessary, Grant Movants relief from the automatic stay to qualify for PPP financing. That such relief will also allow Bullet & Barrel to reduce its interest expense by obtaining Section 504 Loan funds also weighs in favor of authorizing Murray to purchase Additional Units.

**I.     The automatic stay does not prevent Murray from purchasing Additional Units in Bullet & Barrel under the B&B Agreement.**

When a debtor files a bankruptcy petition, an automatic stay applies to "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate[.]" 11 U.S.C. § 362(a)(3). "If property is not property of the estate, then the automatic stay does not protect it." *In re Dudley*, 2019 WL 1301876, *7 (Bankr. N.D. Ala. Mar. 19, 2019) (quoting *Singer Furniture Acquisition Corp. v. SSMC, Inc. N.V.*, 254 B.R. 46, 56 (M.D. Fla. 2000)).

The automatic stay should not prevent Bullet & Barrel from issuing Additional Units in accordance with the B&B Agreement. To be sure, Debtor's Units in Bullet & Barrel constitute property of his bankruptcy estate, but Units belonging to other Members and the assets of Bullet & Barrel plainly do not. Accordingly, bankruptcy courts consistently hold that (1) a limited liability company and its members are separate legal entities, and (2) in such member's bankruptcy case, although the member's membership interests are property of the member's bankruptcy estate under Bankruptcy Code § 541(a)(1), the limited liability company's property is not. *See*, *e.g.*, *In*

9

Case 18-83442-CRJ11    Doc 319    Filed 04/03/20    Entered 04/03/20 14:16:09    Desc
Main Document      Page 9 of 14

*re McCormick*, 381 B.R. 594, 597–600 (Bankr. S.D.N.Y. 2008).[5] Murray's Units are not property of the estate, Bullet & Barrel's assets are not property of the estate, and no authority indicates that Murray's purchase of Additional Units pursuant to § 10.10(b) of the B&B Agreement would violate the automatic stay. Therefore, the Court should enter an order clarifying that the automatic stay does not prohibit the Movants from following the plain and unambiguous provisions of the B&B Agreement, which allow Murray to purchase Additional Units so that Bullet & Barrel can qualify for the PPP relief and a Section 504 Loan.

**II.    If the automatic stay applies, then the Movants are entitled to relief from the automatic stay.**

"Where the automatic stay applies, the bankruptcy court must grant relief from the stay for cause, upon request of a party in interest." *In re Ware*, 562 Fed. Appx. 850, 852 (11th Cir. 2014) (citing 11 U.S.C. § 362(d)(1)). The bankruptcy court must also grant such relief where the "property is not necessary to an effective reorganization." 11 U.S.C. § 362(d)(2).

---

[5] For additional authorities supporting the proposition that the property of a limited liability company whose member is a bankruptcy debtor does not constitute property of that member's bankruptcy estate, *see also In re HSM Kennewick, L.P.*, 347 B.R. 569, 572 (Bankr. N.D. Tex. 2006) ("It is an elementary principle of corporate law that a corporation and its stockholders are separate entities and that title to corporate property is vested in the corporation and not in the owners of the corporate stock."); *In re Stadler*, 2005 WL 6487189, at *2 (Bankr. N.D. Ga. 2005) ("Section 362(a) does not proscribe actions brought against nondebtor entities, even where there is a close nexus between those nondebtors and their bankrupt affiliates. That concept has consistently been confirmed and applied in a host of cases everywhere …. And the doctrine applies with equal force even where the nondebtor is a corporation wholly owned by the debtor ….") (internal citations omitted); *In re Andarakes*, 2004 WL 2905325, at *3 (B.A.P. 10th Cir. 2004) (finding that debt was incurred by an entity in which the debtor was an owner, not the debtor); *In re KRSM Props., LLC*, 318 B.R. 712, 718 (B.A.P. 9th Cir. 2004) ("The LLC is a distinct legal entity with a separate existence from its members and with all the powers of a natural person in carrying out its business activities."); *In re Ireland*, 2004 WL 2340040, at *5–*6 (B.A.P. 10th Cir. 2004) (affirming finding that a limited liability company, not the debtor, was the obligor under certain agreements); *In re Calhoun*, 312 B.R. 380, 383–85 (Bankr. N.D. Iowa 2004) ("The LLC is … an entity separate and distinct from its members and managers[;]" as such, "when an LLC and one of its members both seek to file a bankruptcy petition, they must do so separately."); *In re DVI, Inc.*, 305 B.R. 414, 416–18 (Bankr. D. Del. 2004) (holding that the bankruptcy court had no related-to jurisdiction over an adversary proceeding commenced by the debtor in possession to collect on accounts receivable that were not property of its estate); *In re Rodio*, 257 B.R. 699, 700–02 (Bankr. D. Conn. 2001) (holding that "while the debtor's membership interest in [a limited liability company] is property of the debtor's estate, property of [that limited liability company] is *not*.") (emphasis in original).

a. **Ensuring Bullet & Barrel's eligibility to obtain funds through the PPP is cause for relief from the automatic stay; therefore, Movants are entitled to relief under Bankruptcy Code § 362(d)(1).**

Because the Bankruptcy Code does not define cause, the determination whether to grant relief for cause must be made on a "case-by-case basis." *Laguna Assocs. Ltd. Partnership v. Aetna Cas. & Sur. Co. (In re Laguna Assocs. Ltd. Partnership),* 30 F.3d 734, 737 (6th Cir. 1994). "[T]he term "cause" is a broad and flexible concept which permits a bankruptcy court, as a court of equity, to respond to inherently fact-sensitive situations." *In re Indian River Estates, Inc.,* 293 B.R. 429, 433 (Bankr. N.D. Ohio 2003). *See also Matter of Growth Dev. Corp.*, 168 B.R. 1009, 1017 (Bankr. N.D. Ga. 1994) ("The term "cause" is not defined in the Bankruptcy Code. Instead, courts are required to make fact-specific inquiries and decide on a case by case basis whether cause exists to grant a creditor relief from the automatic stay.") (citing *Christensen v. Tucson Estates, Inc. (In re Tucson Estates, Inc.)*, 912 F.2d 1162, 1166 (9th Cir. 1990); *Universal Life Church, Inc. v. United States (In re Universal Life Church, Inc.)*, 127 B.R. 453, 455 (E.D. Cal. 1991)).

A limited liability company business applicant with any 20% or greater owner in bankruptcy is not eligible to participate in PPP. To apply for PPP funds, applicants are required to submit SBA Form 2483.[6] The instructions provided on page three of the PPP Application Form provides that "[a]ll [members owning 20% or more of a limited liability company] are considered owners of [such] Applicant Business as defined in 13 CFR 13 CFR § 120.10, as well as 'principals.'" (Ex. B, 3). Elsewhere, the form asks whether "any owner [is] … presently involved in any bankruptcy." (*Id.*, 1). If the answer to this question is "'Yes,' the [PPP] loan will not be approved." (*Id.*).

---

[6] The PPP Application Form is available at the following link: https://www.sba.gov/sites/default/files/2020-03/Borrower%20Paycheck%20Protection%20Program%20Application.pdf. A true and correct copy of the PPP Application Form is attached as **Exhibit "A"**.

Bullet & Barrel's ability to obtain funds through the PPP in the face of uncertain economic circumstances is cause for relief from the automatic stay. Even with PPP funds, Bullet & Barrel's ability to cover payroll, benefits, mortgage payments, and other operating expenses as they become due cannot be guaranteed. But the relief Congress intended to provide struggling businesses, like Bullet & Barrel, through the PPP under the CARES Act will certainly increase the probability that Bullet & Barrel can survive as a business, thereby increasing the probability that Debtor's Units would have some value in the future. Therefore, to the extent that the Court finds that the automatic stay applies, the Court should lift the automatic stay to allow Bullet & Barrel to issue and sell Additional Units to Murray, pursuant to B&B Agreement §10.10(b), so that the company can qualify for financial relief under the PPP and a Section 504 Loan, pursuant to Bankruptcy Code § 362(d)(1).

Bullet & Barrel, like most businesses, needs to apply for PPP funds as soon as possible. As discussed above, Bullet & Barrel's efforts to obtain SBA funds have been previously thwarted by this Case. Movants have never before sought relief from the automatic stay to allow Murray to purchase Additional Units to qualify for the Section 504 Loan, relying on the assumption that this Case and the AP would be resolved well before July 17, 2021—when Bullet & Barrel's 504 Loan approval will expire. These calculations were made before COVID-19 fundamentally altered the face of the global economy, and Bullet & Barrel has already begun to feel the impact of economic forces beyond its reasonable control. (Murray Decl., ¶ 12). In an effort to keep Bullet & Barrel's doors open so that Units in the company might one day have value, Movants seek authorization for Murray to purchase Additional Units, pursuant to B&B Agreement § 10.10(b), so that the company can qualify for the immediate financial relief Congress intended.

b. **Retaining 49% of the all outstanding Units in Bullet & Barrel is not necessary to the Debtor's reorganization; therefore, Movants are entitled to relief under Bankruptcy Code § 362(d)(2).**

Debtor's Plan does not indicate that retaining a 49% interest in Bullet & Barrel is necessary for an effective reorganization. For example, the Plan does not propose to transfer or assign Debtor's Units to facilitate distributions to creditors. Nor is the Debtor's percentage interest in Bullet & Barrel otherwise relevant to the feasibility of his proposed Plan.

Nothing in the Debtor's Plan suggests that his current proportional interest is necessary or even relevant to an effective reorganization in this Case. Therefore, Movants are entitled to relief from the automatic stay under Bankruptcy Code § 362(d)(2) to allow Bullet & Barrel to obtain the financial relief Congress intended, as well as a Section 504 Loan with historically low interest.

## Conclusion

For the foregoing reasons, the Movants respectfully request that the Court enter an order enabling Bullet & Barrel to issue Additional Units to Murray so that Bullet & Barrel may qualify for financial relief under the PPP enacted by the CARES Act, as well as Section 504 Loan financing, by (i) clarifying that the automatic stay does not prohibit Murray from purchasing Additional Units in accordance with the B&B Agreement; or, in the alternative, (ii) granting Movants' request for relief from the automatic stay; and (iii) granting such other and further relief as is just and proper.

Dated: April 3, 2020

/s/ Christian A. Pereyda
S. Andrew Kelly
Christian A. Pereyda

*Attorneys for Melanie Hammer Murray and Bullet & Barrel, LLC*

**OF COUNSEL:**

Jayna P. Lamar
Walter A. Dodgen

S. Andrew Kelly
Christian A. Pereyda
MAYNARD, COOPER & GALE, P.C.
1901 Sixth Avenue North
2400 Regions/Harbert Plaza
Birmingham, Alabama 35203
Telephone: (205) 254-1854
Facsimile:  (205) 254-1999
jlamar@maynardcooper.com
dkelly@maynardcooper.com
cpereyda@maynardcooper.com

655 Gallatin Street S.W.
Huntsville, Alabama 35801
Telephone: (256) 551-0171
Facsimile:  (256) 512-0119
tdodgen@maynardcooper.com

## CERTIFICATE OF SERVICE

I hereby certify that on April 3, 2020, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record, and on the following:

| | |
|---|---|
| John J. Callahan, Jr.<br>Lisa English<br>CALLAHAN P.C.<br>Post Office Box 2564<br>Huntsville, Alabama 35804<br>Telephone: (256) 382-5180<br>Facsimile: (256) 704-0165<br>jcallahan@callahanpc.com<br>lenglish@callahanpc.com | Stuart M. Maples<br>MAPLES LAW FIRM, P.C.<br>200 Clinton Avenue West<br>Suite 1000<br>Huntsville, Alabama 35801<br>Telephone: (256) 489-9779<br>Facsimile: (256) 489-9720<br>smaples@mapleslawfirmpc.com |

Richard Blythe
Bankruptcy Administrator
P.O. Box 3045
Decatur, AL 35602
richard_blythe@alnba.uscourts.gov

/s/ Christian A. Pereyda
*Of Counsel*